UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>DONNELL RUSSELL,<br><br>      Defendant. | No. 20-cr-427 (AMD) |

**DEFENDANT RUSSELL'S SENTENCING MEMORANDUM**

Dated:    November 3, 2022    /s/ Michael G. Freedman
THE FREEDMAN FIRM PC
10100 Santa Monica Blvd., Suite 300
Los Angeles, CA 90067
Telephone: (310) 285-2210
E-Mail: michael@thefreedmanfirm.com

Attorney for Defendant Donnell Russell

## INTRODUCTION

Defendant Donnell Russell respectfully submits his sentencing memorandum ahead of his sentencing hearing on November 17, 2022.  As Mr. Russell explained to the Court during his change of plea colloquy, he accepts responsibility for crossing the line in his attempts to curry favor with Robert Kelly by engaging inappropriately with an individual suing Mr. Kelly.  Mr. Russell recognizes that his conduct was unlawful.  But he urges the Court to recognize that his conduct was an aberration when compared with the full picture of Mr. Russell's otherwise exemplary life.  As discussed in this memorandum, Mr. Russell overcame difficulties early in his life to build a successful, multi-faceted career as an entertainer and entertainment executive who has helped countless artists.  Indeed, it was in that capacity that Mr. Russell became connected with Mr. Kelly, leading to the missteps for which he has accepted responsibility and will be sentenced.  In addition to his successful career, Mr. Russell is a devoted family man with numerous children dependent on him.  Although Mr. Russell's Guidelines range is 24-30 months, Mr. Russell respectfully submits that, under the factors enumerated in 18 U.S.C. § 3553(a), a below-Guidelines sentence of probation is a fair and just sentence in this case.

## **GUIDELINES CALCULATIONS**

The Presentence Investigation Report ("PSR") calculated the Guidelines as follows, and Mr. Russell agrees:

| | | |
|---|---|---|
| Base Offense Level: | 18 | (U.S.S.G. § 2A6.2(a)) |
| Specific Offense Characteristics: | +2 | (U.S.S.G § 2A6.2)(b)(1)(E)) |
| Acceptance of Responsibility: | -3 | (U.S.S.G. § 3E1.1(a), (b)) |
| Total Offense Level: | 17 | |

(PSR ¶¶ 29-38).

The PSR calculated Mr. Russell's criminal history category as I, with which he also agrees. (PSR ¶¶ 39-48). This results in a Guidelines range of 24-30 months. Probation recommends a sentence of 24 months' custody followed by one year of supervised release.

In particular, the PSR correctly notes that Mr. Russell's conviction in his related Southern District case does not result in a criminal history point because the conduct at issue in that case is part of the instant offense under U.S.S.G. § 1B1.3 (PSR ¶ 46.). Probation in this case has also recommended that any sentence imposed by this Court run concurrent to Mr. Russell's sentence in the Southern District of New York. Mr. Russell was convicted on July 22, 2022 of count two in *United States v. Donnell Russell*, 20 CR 538 (PGG) (S.D.N.Y.), charging a violation of 18 U.S.C. § 875(c). Mr. Russell is presently scheduled to be sentenced

2

in that matter on November 21, 2022, but is seeking a brief continuance of that date by approximately one-month owing to the delayed release of the PSR on October 28, 2022. A telephonic status conference is set in that matter on November 4, 2022, at which time Mr. Russell expects his sentencing date will be confirmed. Mr. Russell's Guidelines range in that matter is 10-16 months and he will also be seeking a term of probation, with any sentence imposed to run concurrently to the sentence imposed by this Court.

## ARGUMENT

**A. A Below Guidelines Sentence Is Justified Under 18 U.S.C. § 3553**

While the sentencing guidelines are the starting point for the Court's consideration of sentencing, the guidelines do not adequately address all of Mr. Russell's life circumstances, the circumstances of his offense, and the other punishment he has and will continue to suffer as a result of his offense.

The core principles of sentencing have been resolved by the Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007). "The guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). Factors justifying a sentence outside the guideline range are no longer required to be "extraordinary." *Gall*, 552 U.S. at 47.

### B. Mr. Russell's History and Characteristics Demonstrate His Conduct In This Case Was an Aberration

Mr. Russell was born in Chicago in 1974 and raised by a single mother and his father was never involved in his life. (PSR ¶ 71). Mr. Russell played sports growing up and spent much of his time tap dancing. (*Id.* ¶ 73-74). This evidenced the beginning of his love for music, which continues to this day. In high school, he performed on weekends and was supported by his coach, Arie Easly, a fatherly figure in his life. (*Id.* ¶ 74). He also worked at the time as a traveling barber, as a subway performer, and at a local McDonald's. (*Id.* ¶¶ 74, 103). Mr. Russell's work ethic has been a constant over the past thirty years.

In 1993, after graduating from high school, Mr. Russell's love for music drew him to Columbia College Chicago, where he began pursuing a sound engineering and business-related degree. (PSR ¶ 89). After two years, he withdrew to pursue his tap-dancing career. (*Id.*). This led him to touring the United States with the Irish theatrical show, Riverdance. (*Id.* ¶ 101). What followed were a series of increasingly successful music and business-related jobs that led him to open his own production company, named PM Studio. (*Id.* ¶ 97).

Eventually, Mr. Russell sold the studio and went back to school. (PSR ¶ 97). He attended two, four-month long college courses at the University of Phoenix-Chicago Campus for a software engineering program. (*Id.* ¶ 88). He then left school to start a business, PC Tech, which focused on eradicating piracy to

4

prevent artists from losing money as a result of peer-to-peer file sharing systems that were becoming more prevalent at the time. (*Id.* ¶ 95).

In 2016, Mr. Russell converted PC Tech into Indybuild Corp, which is a combined music, social media, and management platform. (PSR ¶ 94). Indybuild exists to help artists prevent their music from being shared without their consent. (*Id.*). Indybuild works hand in hand with the nonprofit that Mr. Russell founded in 2017, The Altitude Program. (*Id.*). The Altitude Program serves children from marginalized communities by providing them an immersive, three-week training experience that allows them to publish stories on journalism, broadcasting, and work with production professionals in their communities. (*Id.* ¶ 93).

Over the past thirty years, Mr. Russell has taken his passions and built a successful career out of them. Not only that, but he has consistently worked to protect others in the field and to provide opportunities to children with the same passions. In her letter to the Court, Mr. Russell's mother, June Barrett, describes how Mr. Russell "believes in developing people, no matter what their circumstances are" and how he is "driven by his need to assist others with improving their life." (Ex. 1). And his business partner, Mr. El-Amin, writes in his letter to the Court that Mr. Russell has "an unrelenting commitment to helping young, up and coming artists, writers and business people succeed in their careers and avoid the common pitfalls of the industry" and is equally committed to his

5

community and his family. (Ex. 2). Likewise, one of Mr. Russell's investors, Steve Mortensen, describes Mr. Russell as "a forthright person who seeks to help people." (Ex. 3).

In addition, Mr. Russell has a stable and happy home life and is a devoted father. He recently married Alicia Robinson, and the two live together with their combined four children from previous relationships. (PSR ¶¶ 77, 79). He has full custody of his son, Dayton, who is eight years old. (*Id.* ¶ 79). Dayton's mother suffers from substance abuse issues and has been prohibited from seeing Dayton by the family court in Chicago. (*Id.*). Despite Mr. Russell's nonexistent relationship with his own father, he is a good father to Dayton, with whom he has a great relationship. (*Id.*). He is also a father figure to Mrs. Robinson's three sons, Armond, Aaron, and Jimmy, all of whom have great relationships with Mr. Russell as well. (*Id.* ¶ 77). Mr. Russell's mother writes that his presence in his child's life "is of the utmost importance, or otherwise the child could falter" and is also a father figure to his wife's three young sons. Any time in custody will have a profoundly negative impact on Mr. Russell's family.

Mrs. Robinson works for Mr. Russell as his business consultant and developer. (PSR ¶ 77). Recently, Mr. Russell decided to step aside from his leadership position at The Altitude Program so that it would not receive negative attention due to the instant case. (PSR ¶ 93). As a result, Mrs. Robinson now also

6

runs the nonprofit. (*Id.*). Mr. Russell also employs his mother as his company's investor relations manager and bookkeeper. (PSR ¶ 71). His hard work and dedication have not only provided him with success but have also allowed him to share opportunities and success with his loved ones. A custodial sentence would have an unnecessarily harsh impact on his family.

### C. Circumstances of the Offense

Mr. Russell pleaded guilty on July 26, 2022, to one count of interstate stalking, in violation of 18 U.S.C. § 2261A(2)(B) and 2261(b)(5). (PSR ¶ 1). The facts underlying this conviction are as follows.

On May 21, 2018, an attorney for Jane Doe filed a lawsuit on Jane Doe's behalf against R. Kelly. (PSR ¶ 5). The lawsuit included the attorney's office address in Brooklyn. (*Id.*). On November 20, 2018, Mr. Russell mailed an envelope to the attorney's office containing the following: a letter directing the attorney to advise Jane Doe to drop her case against R. Kelly; a document entitled "Testimony," which set forth an under-oath statement purporting to be signed by R. Kelly; a notice of delivery; a copy of several court documents relating to the lawsuit against R. Kelly; and two documents containing partially nude photographs of Jane Doe, as well as related text. In one of these two documents, Mr. Russell included text that read "The next two pictures have been cropped for the sake of not exposing her extremities to the world, yet!!!" (PSR ¶¶ 6-8). This language was

7

intended to convince Jane Doe to drop the lawsuit to prevent having the pictures publicly released. (*Id.* ¶ 9).

On December 4 and 5, 2018, Mr. Russell sent emails to an individual known to the Government that included photographs and information related to various of R. Kelly's accusers, including the photographs of Jane Doe. (PSR ¶¶ 12-15). On December 21, 2018, Jane Doe and her mother received a series of text messages from a T-Mobile phone number associated with Indybuild Corp. (*Id.* ¶ 16). A Facebook page called "Surviving Lies" was created by an account associated with the same phone number. (*Id.* ¶ 17). The Facebook page targeted Jane Doe and another R. Kelly accuser and posted the photographs previously discussed. (*Id.*).

Mr. Russell addressed the Court during his change of plea hearing and admitted to his conduct. While explaining that he was trying to help Mr. Kelly in his legal affairs, he admitted that he nonetheless knew what he did was unlawful.

**D. Need for Just Punishment**

Mr. Russell's mistake has already cost him his standing in the community and caused humiliation, stress, and financial hardship. He has already had to step back from running his nonprofit to protect it from any related negative publicity. (PSR ¶ 93). These are factors the court should consider in fashioning an appropriate sentence. *See United States v. MacKay*, 20 F.Supp.3d 1287, 1297 (D. Utah 2014), aff'd, 610 F. App'x 797 (10th Cir. 2015) ("[R]ecognizing that the

8

sentence imposed on MacKay must be just, the Court does not entirely disregard the considerable negative impacts this case has already had on him and his family. He has already lost standing in his community, lost his job, and otherwise experienced major financial setbacks, and has no doubt suffered many emotional pains and negative health consequences that accompany such a process"); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Vigil*, 476 F.Supp.2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation and widespread media coverage).

### E. The Need to Avoid Unwarranted Sentencing Disparities

Sentencing Mr. Russell to probation would best meet "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Mr. Russell was charged at the same time as two other individuals associated with Mr. Kelly. One of them, Mr. Williams, pled guilty to arson in violation of 18 U.S.C. § 844(i) for setting fire to a vehicle at the home of a victim-witness and was sentenced to 96 months. (20-CR-395-AMD, Dkt. 22). The other, Mr. Arline, pled guilty to bribery in violation of 18 U.S.C. § 201(b)(3) for offering a victim-witness money not to testify, and was sentenced to time served. (21-CR-44-AMD, Dkt. 43).

9

Mr. Russell's conduct is far more in line with Mr. Arline's than Mr. Williams'.  Unlike Mr. Williams, Mr. Russell did not commit an act of violence toward any witnesses.  Rather, like Mr. Arline, his unlawful conduct was limited to his communications with the witness.  Although those crossed the line, they were not so extreme as Mr. Williams' conduct.  A sentence of probation would appropriately reflect the similarities between Mr. Russell's and Mr. Arline's cases, and avoid unwarranted disparities with Mr. Williams'.

### F. The Need for Deterrence

Section 3553(a)(2) requires courts to consider the need for a sentence to prevent a defendant from engaging in future criminal conduct or endangering society.  *See* 18 U.S.C. § 3553(a)(2)(B)-(C).  In this vein, Congress has advised that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society …." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (note to 18 U.S.C. § 3551). The empirical facts show that Mr. Russell poses virtually no threat of recidivism or danger to society.  As a married 47-year-old, Mr. Russell is among the offenders least likely to recidivate in the entire criminal justice system. *See* U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at 7, 12-13 & Exs. 2, 9- 11 (2016).

Mr. Russell takes responsibility for his conduct in this case in his misguided attempt to aid Mr. Kelly. But he respectfully urges the Court to recognize the conduct for what it was—an aberration in his otherwise exemplary life and career. For that reason, the Court can be assured that he will not reoffend, and that a custodial sentence is not necessary for deterrence.

## CONCLUSION

For all the foregoing reasons, Mr. Russell respectfully requests that the Court impose a below-Guidelines sentence of probation.

Respectfully submitted,

/s/ Michael G. Freedman
THE FREEDMAN FIRM PC
10100 Santa Monica Blvd., Suite 300
Los Angeles, CA 90067
Telephone: (310) 285-2210
E-Mail: michael@thefreedmanfirm.com

Attorney for Defendant Donnell Russell

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2022, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

/s/Michael G. Freedman
Michael G. Freedman
